IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

*v.*

JAHZIAH ROY Lewis

Criminal Action No.

1:20-CR-365-3-TWT-LTW-3

**Sentencing Memorandum**

The United States of America, by Kurt Erskine, Acting United States Attorney, and Dashene A. Cooper, Assistant United States Attorney, for the Northern District of Georgia, file this Sentencing Memorandum and request that Jahziah Roy Lewis be sentenced to a term of imprisonment of 108 months.

Lewis was a gun and drug trafficker, who organized the shipment of dozens of firearms domestically and international to the United Kingdom and the Caribbean. In doing so, Lewis arranged for the obliteration of serial numbers for these firearms and had the firearms hidden in various items to avoid detection by custom officials.  Lewis also organized the shipment of kilograms of marijuana outside of the county. Lewis was brought to justice as he attempted to flee the United States for the United Kingdom.

I.  **Background**

    A.  **Offense**

On October 4, 2020, Jahziah Roy Lewis was arrested on a complaint, which charged him with gun trafficking as he attempted to board a plane on a one-way ticket headed to the United Kingdom, which he purchased a few days earlier. Roughly a week later, Lewis, Clairvorn Kelly, and Deja Bess were named in the thirty-five-count First Superseding Indictment returned and filed in the Northern District of Georgia on October 13, 2020.  (Presentence Report ¶ 1). On June 8, 2021, Jahziah Roy Lewis pleaded guilty to Counts: One **(Conspiracy to Make False and Fictitious Written Statements to a Licensed Firearms Dealer),** Twenty-seven **(Possession of a Firearm with an Obliterated Serial Number),** Twenty-nine **(Submitting False Export Information),** and Thirty-four **(Possession with Intent to Distribute Marijuana).**

    B.  **Factual Background**

Lewis is a firearm and drug trafficker.  He was born in St. Kitts but later became a United Kingdom citizen.  Lewis traveled to the United States on a temporary non-immigrant visa.[1]

Lewis's firearm trafficking operation popped on law enforcement's radar screen in February 2020, when United Kingdom (UK) police seized three Taurus firearms destined to be sold into the criminal market in the UK. (PSR ¶ 22). The

---

[1] A nonimmigrant visa (NIV) is issued to a person with permanent residence outside the United States, but wishes to be in the U.S. on a temporary basis for tourism, medical treatment, business, temporary work or study, as examples.

UK police arrested three people and charged them with conspiracy to supply firearms. *Id.* UK Police provided the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) with serial numbers recovered six firearms, which led ATF agents to Lewis's straw purchasers, co-defendants Clairvorn Kelly and Deja Bess. According to purchasing records, Kelly purchased the three Taurus pistols recovered in the United Kingdom on December 4, 2019. *Id.* Less than two weeks later, UK authorities intercepted two more firearms, which were purchased by Bess. *Id.* And further investigation showed that Kelly had purchased two firearms in October 2019.

Based on these recoveries, ATF began to research Kelly and Bess's firearm purchases more closely. The investigation showed that Kelly and Bess purchased a total of **39 firearms.** *Id.* at ¶ 23. With these findings, ATF agents interviewed Kelly, who confessed that he purchased numerous firearms at Lewis's behest. *Id* at ¶ ¶ 51-58. He also recruited Bess to purchase an additional 10 firearms. Kelly told investigators that he obliterated the serial numbers and shipped the firearms at Lewis's direction. *Id.* After obliterating the serial numbers, Lewis explained to Kelly where to mail the firearms. *Id.* But before mailing the firearms, Lewis explained how to hide the items to avoid detection. Kelly and Bess also used false names on the shipping label to further avoid law enforcement. To corroborate his confession, ATF reviewed Kelly's cellphone which was replete with messages between Lewis and Kelly. (*Id.* at ¶ 53). After delivering the firearms, Lewis paid Kelly roughly $200-$300 for each smuggled firearm. Kelly admitted that he sent firearms to following USVI St. Croix / Nevis,

United Kingdom. Cashier checks, PayPal, Western Union and other payment information corroborate Kelly's confession.

Lewis, however, did not stop there. Lewis decided to diversify his trafficking operation and directed Kelly to smuggle marijuana both domestically and internationally. *Id.* at ¶ 53. As with the firearms, Kelly purchased marijuana and then hid the drugs in various containers to avoid detection. However, two of these shipments were intercepted. On April 29, 2020, Kelly shipped 1.54 kilograms of marijuana to St Kitts. *Id.* at ¶ 60. And two months later, Kelly again attempted to ship an additional 2.95 kilograms of marijuana, this time to St. Maarten.

Following his confession, Kelly told investigators that just three days before their arrival (June 6, 2020), Lewis requested that Kelly procure "machine guns" for him for a future shipment. *Id.* at ¶ 54. Investigators asked Kelly whether they could participate in a meeting with Lewis. And Kelly agreed. Less than a week later, ATF SAs Spath and Gray met with Kelly at a Subway parking lot to place a consensually monitored and recorded video call to Lewis regarding the "machine guns" Lewis requested. Kelly and Lewis spoke to each other via Facetime video, while agents monitored and recorded it. *Id.*

During the call, Kelly and Lewis discussed the purchase of a Micro Draco AK style pistol and obtaining four (4) Glock pistols for approximately $450.00 each. Lewis requested Kelly purchase AR-15 style weapons for further shipment. Kelly explained the price points to Lewis, which varied based on accessories provided with the weapon. Lewis directed Kelly to buy one rifle. (*Id.* at ¶ 57). Lewis stated

4

that he was interested in getting all of the firearms and that he would contact Kelly later. Lewis sent approximately $700 to Kelly via Cash App for the purchase. The transfer was also witnessed by the law enforcement officers present. *Id.* During the call, Lewis also mentioned that *he* was still waiting to get some marijuana to Kelly.

On June 12, 2020, Kelly met again with law enforcement to conduct a consensually monitored video call with Lewis. Both video and audio recording were clear. Lewis was positively identified on the video by ATF SAs Spath and SA Gray. Per Lewis's request, Kelly provided photos of firearms available to purchase, specifically Micro Draco AK-47 pistols. Lewis agreed to purchase the firearm on a later date. Kelly also told Lewis he could obtain four Glock pistols requested by Lewis. Lewis told Kelly to purchase those weapons with money to be provided at a later date. Lewis then told Kelly he (Lewis) would give him further instructions about the destination and shipping location of the weapons on a later date.

On October 1, 2020, the same day the Indictment against him was unsealed, Lewis obtained an outbound ticket for a flight from the United States to the United Kingdom set to depart on October 4, 2020. *Id.* at ¶ 62. On October 5, 2020, Lewis was arrested without incident at the airport in Miami, Florida. He did not give a statement incident to arrest. *Id.* at ¶ 63.

**Offense Level**

   A. Base Offense Level- *Prohibited Person*

The probation office prepared a PSR determining that Lewis's base offense level is 14 under U.S.S.G. § 2K2.1(a)(6)(A). (PSR ¶ 41). The probation writer is correct that the guideline for 18 U.S.C. §§ 371, 922(a)(6), 922(k) and 2, and 13 U.S.C. §305 offenses is found in USSG §2K2.1 of the guidelines. Pursuant to U.S.S.G. § 2K2.1(a)(6)(A), the base offense level is 14 because Lewis was a prohibited person at the time he committed the offense. Pursuant to U.S.S.G. § 922(g)(5)(B), it is unlawful for any person who, being an alien, except as provided in subsection (y)(2), to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition which has been shipped or transported in interstate or foreign commerce. None of the exceptions apply to Lewis in this case.

Said differently, aliens admitted on nonimmigrant visas (and hence not illegally or unlawfully in the United States) are prohibited from possessing firearms under § 922(g)(5)(B), with certain exceptions. *See United States v. Elrawy*, 448 F.3d 309, 316 (5th Cir. 2006). Lewis is not a permanent resident but was here in the United States on a nonimmigrant visa. Indeed, Section 922(g)(5)(B) quite clearly prohibits possession of firearms by all those admitted to the United States under a nonimmigrant visa. Section 922(y)(2) includes an exception to this general rule for nonimmigrant visa holders who visit the United States for lawful hunting or sporting purposes. *United States v. Singh*, 979 F.3d 697, 725 (9th Cir. 2020). Here, Lewis does not claim that one of those exceptions apply and the Probation Officer properly concluded that Lewis was a prohibited person and his base level offense in this case is 14.

*B. Six Level Enhancement for over 25 firearms*

The Probation Officer properly concluded that pursuant to U.S.S.G. §2K2.1(b)(1)(C), the base offense level is increased by 6 levels because the offense involved more than 25, but less than 99 firearms. The instant offense involved 39 firearms. Both Bess and Kelly have already pleaded guilty in this case to straw purchasing the firearms listed in the indictment.

The government must show—as it has—that there is a preponderance of evidence that the firearms in this case are attributable to Lewis. *See United States v. Mena*, 342 F. App'x 656, 658 (2d Cir. 2009) (noting that "the preponderance of the evidence standard does not require 'proof that is free from uncertainty.'").

Notably, both Kelly and Bess have pleaded guilty (under penalty of perjury) to straw purchasing and Kelly has confessed that all the firearms he purchased (and directed Bess to purchase) were for Lewis. And there is corroboration for his confession.

*First*, six of the firearms and ammunition that Kelly purchased was intercepted by UK Police. *Second*, there are text messages between Lewis and Kelly directing purchases for firearms. *Third*, law enforcement observed Lewis selecting and purchasing firearms for Lewis during a Facetime conversation. And during the call, Lewis directed Kelly to purchase the same make/model firearm, which is consistent with the type of gun purchases Kelly made in the past. *Fourth*, Kelly's financial records support that Kelly was receiving money to purchase the firearms and Lewis provided a CashApp payment in ATF's presence. In conclusion, other than quibbling that 2 of the 39 firearms were still in Kelly's possession during the

7

execution of the search warrant, the Probation Officer properly concluded that a six-level enhancement applied because the offense involved over 25 but less than 99 firearms.

*C. Obliterated Serial Numbers*

Pursuant to U.S.S.G. §2K2.1(b)(4)(B), the Probation Officer determined that the base offense level is increased by 4 levels because two of the firearms seized in the UK had obliterated serial numbers.

There is no objection by the parties to this finding.

*D. Firearm Trafficking*

Pursuant to U.S.S.G. §2K2.1(b)(5), the Probation Officer determined that the base offense level is increased by 4 levels because the defendant engaged in the trafficking of firearms.

Here, the defendant was involved in transporting pistols and revolvers to the U.K. and in the Caribbean. With respect to the finding that Lewis knew or had reason to know that the person receiving the firearm was unlawful, the U.K. law is straightforward. Firearms control in the UK is among the toughest in the world. And "firearms, shotguns or ammunition must be freely declared to Border Force upon importation." See "Guide on Fireams Licensing Law", April 2016, available at:https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/518193/Guidance_on_Firearms_Licensing_Law_April_2016_v20.pdf, (Last Accessed: September 9, 2021). Indeed, Section 5(1A) of the 1968 Act makes it unlawful to purchase, acquire or possess, without the authority of the Secretary of State, any prohibited weapon or ammunition. *Id.* There is no

evidence that the person receiving the guns Lewis sent either had authority from the Secretary of State and the evidence clearly shows that the firearms were not declared.

*Second,* according to the purchase receipts, the Taurus firearms recovered in the United Kingdom retailed for approximately $300 in the United States. Lewis, however, paid Kelly between $200-300 per gun over the retail price for these firearms, which he then sold on the black market. *See United States v. Juarez*, 626 F.3d 246, 252 (5th Cir. 2010) (affirming district court's application of §2K2.1(b)(5) where defendant received a $200 premium above retail price to transport firearms to unknown individuals in Mexico). The fact that Lewis paid such a high premium for the firearms and sold them at an even higher price overseas, demonstrates that Lewis had reason to believe that the UK buyers were not lawful purchasers. Indeed, as the Probation Officer notes, three individuals were arrested in the UK and charged with conspiracy to supply firearms in connection with this case. *See* PSR ¶ 22.

*Third,* Lewis directed Kelly to hide the firearms and ammunition in hidden containers and declared as other items that firearms. This shows that Lewis had reason to know that the buyer of the firearms did not want customs officials to know what items were hidden in the containers. Therefore, the very clandestine nature of the shipments support a finding that Lewis had reason to know individuals who possessed or received the pistols or revolvers in the U.K. would be doing so unlawfully. Based on the foregoing, the Probation Officer's finding that U.S.S.G. §2K2.1(b)(5) applies should be sustained.

With respect to whether Lewis had reason to know that the U.K. buyer planned to use the firearms unlawfully, there is reason to believe there is separate grounds to conclude this fact. Defendant concedes that he at the very least participated in the obliteration of the serial numbers for the firearms found in the United Kingdom. The very point of obliterating firearms is an attempt to make tracing them very difficult, if not impossible, when discovered at crime scenes. *See United States v. Green*, 360 F. App'x 521, 524–25 (5th Cir. 2010) (holding "the obliteration of serial numbers, which is done in anticipation that the guns will be used in criminal activity, were more than sufficient to meet the preponderance of the evidence standard required for a four level enhancement.").

The clandestine way that the firearms were smuggled into the country also suggests that there was reason to believe they would be used in an unlawful manner. For example, in *United States v. Mena*, 342 F. App'x 656, 658 (2d Cir. 2009), the Second Circuit affirmed the district court's finding that "the circumstances [of the offense conduct] indicate by a preponderance of the evidence that [defendant] knew or had reason to believe that his delivery of the firearms was to someone or people who intended to use or dispose of the firearms unlawfully," where defendant twice delivered guns in a plastic bag in exchange for cash on a street in Manhattan. The circuit court noted that the district court's "acknowledged uncertainty regarding whether [defendant] actually had such knowledge or reason to believe [did] not preclude the conclusion that a preponderance of the evidence supported the fact. As the district court aptly observed, the

preponderance of the evidence standard does not require "proof that is free from uncertainty." *Id.*

### E. Transport Firearms out of State

Pursuant to U.S.S.G. §2K2.1(b)(6)(A), the Probation Officer increased the base offense level by 4 levels because the defendant possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be transported out of the United States. In the instant offense, Lewis directed codefendants to mail firearms to the U.K.

The parties do not object to this finding.

### F. Adjustment for Role in the Offense

Pursuant to U.S.S.G. §3B1.1(c), the Probation Officer concluded that Lewis was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b); therefore, two levels are added. The Guidelines provide for a two-level increase, in pertinent part, "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity." U.S.S.G. § 3B1.1(c). "[T]he assertion of control or influence over only one individual is enough to support a § 3B1.1(c) enhancement." *United States v. Phillips*, 287 F.3d at 1058 (quoting *United States v. Jiminez*, 224 F.3d 1243, 1251 (11th Cir.2000)).

In the instant offense, the defendant organized, managed and supervised Kelly regarding the type of weapons to purchase and where to send them. Kelly, in turn, recruited Bess, with whom he was romantically involved, to assist. While Lewis claims he was simply a purchaser of firearms and drugs, the evidence in this case weighs against his argument. The Facetime video and text messages show that

11

Lewis directed Kelly as to what items he was to purchase. That Lewis paid Kelly for the firearms. Lewis then directed Lewis where to send the firearms and how to conceal the firearms, including obliterating the serial numbers on the firearms.

The case of *United States v. Paye*, 129 F. App'x 567 (11th Cir. 2005), is in instructive. In that case, the 11th Circuit affirmed the district court's application of a two-level enhancement where the evidence showed that defendant (1) asked a third party to purchase firearms for him in exchange for a payment; (2) drove the third party to various firearms dealers; (3) selected the firearms for purchase and provided money for the firearms; and (4) instructed the third party to file serial numbers off the firearms. *See also United States v. Smith,* 526 F. App'x 912, 918–19 (11th Cir. 2013)(affirming two-level role enhancement where defendant directed individual to purchase specific firearms and allowed individual to keep $100 for the purchase); *United States v. Williams,* 241 F. App'x 911, 911–12 (4th Cir. 2007)(affirming role enhancement where defendant "provided the funds involved in the transaction and directed another participant to purchase a specific type of firearms.").

## Conclusion

For the foregoing reasons, this Court should adopt the correctly calculated advisory Guidelines range set forth in the presentence report and sentence Defendant to a term of imprisonment of 108 months.

        Respectfully submitted,

        KURT ERSKINE
          *Acting United States Attorney*

        /s/DASHENE A. COOPER
          *Assistant United States Attorney*
        Georgia Bar No. 385738
        dashene.cooper@usdoj.gov

## Certificate of Service

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

        BENJAMIN BLACK ALPER

April 6, 2018

        /s/ DASHENE A. COOPER

        DASHENE A. COOPER

        *Assistant United States Attorney*